When she arrived at Surinam, the authorities would not permit the cargo to be landed. The prohibition did not rest upon anything in the character or status of the vessel. The court held that the obtaining permission to land the cargo was the business of the consignee, and that the freight was earned although the cargo was not delivered. The prohibition was like the embargo in Sjoerds v. Luscombe. But, in the present case, the difficulty was with the vessel. She was never in a condition to receive the cargo, because she had failed to comply with the health laws and regulations of the islands. Upon the agreed facts, I can perceive no well founded legal difference between the present attitude of the vessel, and her attitude if she had refused to submit to a lawful quarantine at Palmas, and had, therefore, left without the homeward cargo which she contracted to carry. The true rule is, I think, laid down in Duff v. Lawrence, 3 Johns. Cas. 164, 165. It is that where the owners of a vessel agrees to carry and deliver goods, unless prevented by some of the impediments mentioned in the charter party, many occurrences may take place, and loss or injury arise, in consequence thereof, which were not in contemplation of the parties at the time the charter party was entered into, and, of course, not provided for, and which must be borne by them respectively as it shall happen to fall; and that damage sustained in consequence of the vessel being obliged to perform quarantine, ought to be borne by the owner of the vessel, for it is a temporary prohibition, in no manner provided for in the contract, and which the shipowner ought to submit to, without prejudice to the charterer.

It is claimed by the libellants that, even though the vessel was under an obligation to go to Vigo, the conduct of the charterer's agents at the islands amounted to a waiver of the performance of that obligation. It is alleged that it was the duty of the agent of the charterer, when the vessel arrived at Palmas, to have refused to accept the cargo she carried, or to attempt to supply her with any return cargo, until she had gone to Vigo and quarantined, if the plea now set up in defence was to be made. But I cannot concur in this view. The vessel was bound by the contract to go to both Palmas and Cabras, and her return from the latter port to the former was the result of a mutual arrangement between the master and Hogg, made in good faith on both sides, aside from the charter party. The master was under no obligation to return to Palmas. He might properly have refused to do so, and have gone directly from Cabras to Vigo. The agreed facts show that the charterer's agent always insisted, up to the very last, that the vessel should go to Vigo, and never waived the performance, by the vessel, of her obligation to go there. Nor can the ac-

ceptance of the lumber, or the loading of the wine, excuse the failure of the vessel to put herself in a condition to receive the barilla.

It follows, therefore, that the libellants are not entitled to dead freight, or damages in lieu of freight, on the barilla. Nor are they entitled to damages for loss of time, or expenses incurred by the deviation to St. Thomas on the homeward voyage, as the deviation was not caused by any act or omission of the respondent.

I do not see how the respondent can refuse to pay the freight on the wine, after having accepted it. His agreement is to pay so much per one thousand feet freight on the lumber, on its delivery at the islands, and so much per ton freight on the barilla, and per pipe freight on the wine, on proper delivery. When the lumber was delivered, the freight on it was paid. This is a practical construction of the contract by the respondent. Freight is to be paid, at the agreed rate, on whatever cargo is delivered. Freight is due on the wine, although no barilla was brought. Indeed, the answer does not set up that freight was not earned on the wine. The effect of the answer, in this respect, is merely to claim damages to an extent sufficient to absorb any claim of the libellants. The respondent is entitled to set off or recoup against the freight due to the libellants on the wine, any damage set up in the answer, which he can prove to have arisen out of any breach of the charter party by the libellants, to the extent of the freight, but, for any claim beyond that, the respondent must resort to his own proper action. Zerega v. Poppe [Case No. 18,213]; Thatcher v. McCulloh [Id. 13,862]; Bradstreet v. Heran [Id. 1,792]. The freight to which the libellants are entitled, is the sum of $100, with interest from the time the wine was delivered, without reference to the provision of the charter party in regard to gold. A decree will be entered accordingly.

---

HOLYOKE MUT. FIRE INS. CO. (MAUGER v.). See Case No. 9,305.

---

## Case No. 6,653.

### HOMANS v. COOMBE.

[2 Cranch, C. C. 681.] [1]

Circuit Court, District of Columbia. May Term, 1826.

ATTACHMENT—EXECUTION—JUDGMENT—SURPRISE.

The court will set aside a judgment against the garnishee, obtained at a former term by surprise, and will quash the execution thereon issued.

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

This was an attachment issued by way of execution upon a judgment against Mr. Zantzinger, and the marshal returned that he had "attached credits in the hands of Griffith Coombe, and summoned him as garnishee in the presence of" D. B. and B. O. T., July 28, 1824. At the return of the writ, Mr. Coombe, the garnishee, being called, and not appearing, judgment of condemnation was rendered against him at December term, 1824, for the whole amount due from the defendant, Mr. Zantzinger. The writ of attachment issued under the act of assembly of Maryland of 1715 (chapter 40) does not state any particular sum as being in the hands of the garnishee, nor does it even name a garnishee. It commands the sheriff to attach the goods, chattels, and credits of the defendant to the value of the debt, and have them before the court at the return of the writ, to be condemned to, and for the use of, the plaintiff [Daniel Homans], unless the defendant shall show cause to the contrary; and to make known to the person in whose hands or possession the goods, chattels, and credits shall be attached, to be and appear at the court, at the return day of the writ, to show cause why the same should not be condemned, and execution thereof had as in other cases of recovery and judgment. By the 4th section of the act it is provided, "that no sheriff shall levy, by way of execution as aforesaid, against the said garnishee or garnishees, any more than the plaintiff's debt and costs, nor against any garnishee or garnishees, than what the said plaintiff in the said action shall make appear to the said respective courts, to be of the said goods, chattels, and credits of the said defendant in each respective garnishee or garnishees' hands, together with such costs only as the garnishee or garnishees shall put the plaintiff to, by denying him or themselves to be indebted to such defendant, and contesting the same." At the time of the judgment against Mr. Coombe, the garnishee, there was no evidence before the court to make appear what goods, chattels, or credits were in his hands.

Mr. Key now moved to set aside the judgment against Mr. Coombe, as having been obtained irregularly and by surprise; and produced the affidavit of Mr. Coombe, denying that he ever had any money or property of the defendant in his hands or possession; that knowing that fact, and believing that no person could aver or prove that he had, and that no judgment could be rendered against him without proof, he thought it unnecessary to take any steps for his defence, and the subject passed out of his mind, &c. There were also other corroborating affidavits.

THE COURT, at a subsequent term, set aside the judgment against the garnishee, as having been obtained by surprise, and quashed the execution.

[In Case No. 6,654, in an action against the garnishee, the plaintiff was nonsuited.]

## Case No. 6,654.

### HOMANS v. COOMBE.

[3 Cranch, C. C. 365.] [1]

Circuit Court, District of Columbia. Dec. Term, 1828.

LIEN—BUILDING CONTRACT—COMMENCEMENT OF LIEN.

1. The lien which a builder, in Washington, has under Act Md. 1791, c. 45, § 10, is a remedy in rem only, and not in personam.

2. The lien commences with the recording of the contract for building, and does not overreach prior incumbrances.

Attachment, by way of execution, upon a judgment recovered by [Daniel] Homans against Zantzinger, for balance due upon a building contract. The attachment was served upon credits in the hands of G. Coombe, who was summoned as garnishee, and pleaded nulla bona. The building contract was dated 17th September, 1816, but not acknowledged and recorded until the 14th of May, 1817. The deed of trust, under which Mr. Coombe purchased the house, was executed on the 9th of May, 1817, five days before the acknowledgment of the building contract. The plaintiff had, within two years after the last of the work was done, proceeded at law, by an action against Mr. Zantzinger, upon the contract, and, on the 22d of June, 1819, recovered the judgment upon which this attachment was issued, by way of execution, under the Act Md. 1715, c. 40. Mr. Coombe had paid his purchase-money to the trustee, who sold the house under the deed of the 9th of May, 1817, and the question was, whether Mr. Homans had a lien on the house and lot prior to that of the said deed of trust. By Act Md. 1791, c. 45, § 10, "concerning the territory of Columbia and city of Washington," it is enacted, "that for all sums due and owing on written contracts, for the building any house in the said city, or the brick work, or carpenter's or joiner's work thereon, the undertaker, or workmen employed by the person for whose use the house shall be built, shall have a lien on the house and the ground on which the same is erected, as well as for the materials found by him; provided the said written contract shall have been acknowledged before one of the commissioners, a justice of the peace, or an alderman of the corporation of Georgetown, and recorded in the office of the clerk for recording deeds herein created, within six calendar months from the time of acknowledgment, as aforesaid; and if, within two years after the last of the work is done, he proceeds in equity, he shall have remedy as upon a mortgage; or, if he proceeds at law within the same time, he may have execution against the house and land, in whose hands soever the same may be; but this remedy shall be

---

[1] [Reported by Hon. William Cranch, Chief Judge.]